USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _11/01/2022_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
RED HAWK, LLC,                                          :
                                                        :
                              Plaintiff,                :
                                                        :
              -against-                                 :          20-CV-9032 (VEC)
                                                        :
                                                        :          OPINION & ORDER
COLORFORMS BRAND LLC, OUT OF THE                        :
BLUE ENTERPRISES, LLC, and OOTB                         :
PRODUCTIONS, INC.                                       :
                                                        :
                              Defendants.               :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Plaintiff Red Hawk, LLC ("Red Hawk") sued Defendants Colorforms Brand LLC, Out of

the Blue Enterprises LLC, and OOTB Productions, Inc. (collectively "Defendants") for breach of

the parties' Royalty Agreement for use of the Colorforms brand name.  Am. Compl., Dkt. 51.

Plaintiff has moved to exclude (1) the expert report and testimony of Susan E. Miller regarding

the meaning of the term "Products" as it is used in the Royalty Agreement and (2) the expert

report and testimony of Ezra J. Doner pertaining to the value of a hypothetical frontend license

fee for use of the Colorforms name in connection with filmed entertainment.  Daubert Mot., Dkt.

76.  Defendants have also moved to redact portions of the Miller and Doner Reports pertaining to

the agreed-upon royalty rates, Defendants' business dealings with non-party Netflix, Inc., expert

fees, and Defendants' proprietary information regarding industry agreements; Plaintiff consents

to the requested redactions.  Mot. to Seal, Dkt. 75.  For the reasons stated below, Plaintiff's

*Daubert* motion is GRANTED in part, and Defendants' motion to redact the expert reports is

GRANTED.

**BACKGROUND**

Colorforms is a children's toy comprised of colored, vinyl shapes that cling to smooth surfaces and stack to form patterns and designs.  Am. Compl. ¶ 2.  Through a series of transactions more than twenty years ago that are not relevant to these motions, Plaintiff has the right to royalty payments from Defendant Colorforms Brand LLC for use of the Colorforms name in connection with "Products," as that term is defined in the Royalty Agreement, while Defendant Colorforms Brand LLC owns the Colorforms brand.  *Id.* ¶¶ 3, 10–11.  Red Hawk sued Defendants to recover royalties allegedly due for the use of the Colorforms brand name, including payment for use of the brand name in *Charlie's Colorforms City*, an animated Netflix series.  Am. Compl. ¶¶ 14, 21, 28, 37.

The pertinent provisions of the Royalty Agreement pursuant to which Plaintiff brings its claim obligates the Defendants to pay Plaintiff:

> a royalty payment ("the Royalty") based on aggregate Net Sales of any of [Plaintiff's predecessor's] existing products listed on Schedule 1 or any other products sold by [Defendants] using the "Colorforms" brand name (the "Products") but excluding the [Defendants' predecessor's] Products listed on Schedule 2 . . . .

Cinque Decl. Ex. B ("Royalty Agreement"), Dkt. 79 at 1.

Defendants seek to introduce expert testimony from Susan E. Miller and Ezra J. Doner regarding the Royalty Agreement.  Red Hawk seeks to exclude the report and testimony from Miller to the extent she opines on the meaning of "Products" as used in the Royalty Agreement[1] and from Doner to the extent he opines on what would have been a reasonable frontend license

---

[1]    While some portions of Plaintiff's memorandum of law discuss the Miller Report more generally, *see, e.g.*, Pl. Mem., Dkt. 78 at 3, Plaintiff has only moved "to exclude the expert report and testimony of . . . Susan E. Miller ('Miller') regarding the meaning of the word 'Products' in the Royalty Agreement," *id.* at 1; Pl. Reply, Dkt. 81 at 3 ("Ms. Miller's testimony and report on whether the Netflix series is a 'Product' for purposes of the Royalty Agreement should be excluded.").  The Miller Report opines on several matters beyond the meaning of the word "Products," including "that the Netflix financial contribution to the Series budget is not a proper basis for a royalty." Cinque Decl. Ex. C ("Miller Report"), Dkt. 79 at 5.

fee for the use of the Colorforms' brand name for the Netflix show, had the deal been structured that way.  Daubert Mot., Dkt. 76

### A.  Susan E. Miller

Susan E. Miller has extensive corporate experience with intellectual property licensing and has produced popular children's television and movies.  *See* Cinque Decl. Ex. C ("Miller Report"), Dkt. 79 at 11.  Plaintiff does not dispute that Miller is qualified to opine on product licensing in the relevant markets.  *See* Pl. Mem., Dkt. 78 at 3.

The Miller Report describes contracting practices in the consumer products and television industries, the definitions of widely used terms, including several of the contractual terms disputed in the present case, and whether the royalty agreement is drafted consistently with other contracts that provide licensing fees for television series.  *See* Miller Report at 5–7.  As is relevant to this motion, Miller opines:

> The references to the two schedules — with no description of other types of products, including broadcast, television or film — suggests [sic] that the term 'Products' was intended to cover items similar to the consumer products listed in the schedules.  Additionally, the reference to 'any other products sold,' suggests consumer products that can be 'sold' at retail.

*Id.* at 6.

### B.  Ezra J. Doner

Ezra J. Doner is an attorney who specializes in entertainment law.  Cinque Decl. Ex. E ("Doner Report"), Dkt. 79 ¶¶ 10–19.  Plaintiff does not dispute that Doner is qualified as an expert in licensing practices in the television industry.  *See id.* ¶ 1; Pl. Mem. at 9–10.

As is relevant to this motion, Doner opines that the underlying property license between Defendant Colorforms Brand LLC and Defendant Out of the Blue Enterprises LLC provides significant value to Colorforms Brand LLC, even though it does not include a frontend license

fee.  Doner Report ¶ 9.  Doner further opines that if the Underlying Property License had been

the result of an arm's length negotiation with a third party and had been "structured to include a

[f]rontend [l]icense [f]ee as the principal value flowing to Colorforms LLC," the frontend license

fee for the first two Netflix production orders would likely have been $255,000.  *Id.*.  Doner

defines "frontend" license fees as payments that "are triggered by production but are not

dependent on the commercial performance of the program for which the license is given," in

contrast to "backend" license fees, the value of which depend on commercial performance.  *Id.* ¶

29.

## DISCUSSION

**I.**   ***Daubert* Motion**

### A.  Legal Standard

Federal Rule of Evidence 702 governs expert testimony.  It provides that a person

"qualified as an expert by knowledge, skill, experience, training, or education" may offer opinion

testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier
> of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility

for expert opinions . . . ."  *Nimely v. City of New York,* 414 F.3d 381, 395 (2d Cir. 2005).  The

proffering party bears the burden of establishing admissibility under Rule 702 by showing that

(1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology;

and (3) the proposed testimony would be helpful to the trier of fact, but the district court serves
as the "ultimate gatekeeper" against unreliable expert testimony. *United States v. Williams*, 506
F.3d 151, 160 (2d Cir. 2007) (internal quotation marks omitted).

Ultimately, the threshold question is whether the "proffered expert testimony is relevant."
*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).  An expert's
opinion is relevant if it will "help the trier of fact to understand the evidence or to determine a
fact in issue." Fed. R. Evid. 702(a).  Proffered testimony is not helpful to the jury if it "usurp[s]
either the role of the trial judge in instructing the jury as to the applicable law or the role of the
jury in applying that law to the facts before it." *Nimely*, 414 F.3d at 397 (citation omitted).  An
expert's opinion will be precluded if it "undertakes to tell the jury what result to reach" and
"attempts to substitute the expert's judgment for the jury's." *Id.* (citing *United States v. Duncan*,
42 F.3d 97, 101 (2d Cir. 1994)).  "While an expert may opine on an issue of fact within the jury's
province, an expert may not give testimony stating ultimate legal conclusions based on those
facts." *Snyder v. Wells Fargo Bank, N.A.*, 2012 WL 4876938, at *5 (S.D.N.Y. Oct. 15, 2012)
(cleaned up).

### B.  Miller's Opinions are Admissible in Part and Excluded in Part

Plaintiff objects to the portion of Miller Report discussing "the meaning of the word
'Products' in the Royalty Agreement."  Pl. Mem. at 1.  Plaintiff argues that expert testimony
interpreting the term is irrelevant because "Products" is an unambiguous word used in
accordance with its ordinary meaning, and, thus, the Miller Report does not offer "scientific,
technical, or other specialized knowledge [that] will help the trier of fact to understand the
evidence or to determine a fact in issue." Fed. R. Ev. 702(a); *see also* Pl. Reply, Dkt. 81 at 2–3;
Pl. Mem. at 3–4.  Defendants argue that the Miller Report provides useful context regarding

industry practice to demonstrate that the definition of "Products" urged by Plaintiff is inconsistent with industry usage of the term.  Def. Opp., Dkt. 80 at 6–7.

The threshold question is whether the Royalty Agreement is ambiguous, *see Sunbelt Rentals, Inc. v. Charter Oak Fire Ins. Co.*, 839 F. Supp 2d 680, 687 (S.D.N.Y. 2012) (citation omitted), and "[a]mbiguity is determined by looking within the four corners of the document, not to outside sources," *Lockheed Martin Corp. v. Retail Holding, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (internal quotation and citation omitted).

Pursuant to New York contract law, "a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." [2] *Lockheed Martin Corp.*, 639 F.3d at 69 (internal citation omitted).  It is well established that "the construction of unambiguous contract terms is strictly a judicial function," and unless contractual terms are ambiguous or technical, expert testimony regarding their meaning is "irrelevant and hence inadmissible." *Richards v. Direct Energy Servs. LLC*, 915 F.3d 88, 98 (2d Cir. 2019) (quoting 31A Am. Jur. 2d Expert and Op. Evidence § 294 (2018)).  If a contract is ambiguous, on the other hand, testimony regarding standard industry practice is admissible "to enable the jury to evaluate the conduct of the parties against the standards of the ordinary practice in the industry." *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 509 (2d Cir. 1977) (citing VII Wigmore on Evidence §1949, at 66 (3d ed. 1940)); *see also AU New Haven, LLC v. YKK Corp.*, No. 15-CV-3411, 2019 WL 1254763, at *4

---

[2]      The Royalty Agreement includes a choice of law clause selecting New Jersey law.  Cinque Decl. Ex. B ("Royalty Agreement"), Dkt. 79 at 6.  The parties, however, have relied almost entirely on New York law in their motion papers and have not cited to any New Jersey law.  The Court will, accordingly, apply New York law for the purposes of this motion. *See Sunbelt Rentals, Inc. v. Charter Oak Fire Ins. Co.*, 839 F. Supp. 2d 680, 686 (S.D.N.Y. 2012) (where "both sides have relied almost exclusively on New York law in their motion papers," the "court is not obliged to undertake an investigation of potential differences between New York law" and the law selected by the choice of law clause, *id.* (citation omitted)).

(S.D.N.Y. Mar. 19, 2019) (noting that where a contractual term "is ambiguous, then extrinsic evidence such as industry usage will become relevant").

The Royalty Agreement defines "Products" as all products carrying the Colorforms brand, whether the product was in existence at the time of contracting. *See* Royalty Agreement at 1. The Royalty Agreement lists on Schedule 1 a variety of Colorforms games, books, card games, and sewing games that are expressly included within the definition of "Products;" none of those items appears to have been the basis of a television series or film at the time of contracting. *See id.* at 10–11. Schedule 2 lists products, the sales of which are excluded from Net Sales and, therefore, the calculation of royalty payments. *See id.* at 1. The products on Schedule 2 represent a greater variety of children's entertainment than those on Schedule 1. *Id.* at 12. For example, "Where in the World is Carmen Sandiego?" is included on Schedule 2. *Id.* "Where in the World is Carmen Sandiego?" is a popular geography-themed computer game that has spawned three televisions shows, two of which were in existence at the time of contracting.[3] Schedule 2 also includes Pippi Longstocking, *id.*, the eponymous main character in a children's

---

[3] In this game, the player tracks Carmen Sandiego, a sprightly jewel thief, across the globe. "Where in the World is Carmen Sandiego?" has generated a total of three televisions shows: (1) the 1990s children's animated show "Where on Earth is Carmen Sandiego?", (2) the 1990s children's gameshow "Where in the World is Carmen Sandiego?", (3) and a recent Netflix show, "Carmen Sandiego."

The first two television shows were nominated for numerous Daytime Emmys, and both won an Emmy in 1997, less than a year before the parties entered into the present contract. *See Where on Earth is Carmen Sandiego?*, IMDb, https://www.imdb.com/title/tt0167742/ (last visited Oct. 31, 2022); *Where in the World is Carmen Sandiego?*, IMDb, https://www.imdb.com/title/tt0106172/?ref_=nv_sr_srsg_0 (last visited Oct. 31, 2022); *Daytime Emmy Statue for Rosie; 17th Bust for Lucci*, LATimes (May 22, 1997 12:00 A.M.), https://www.latimes.com/archives/la-xpm-1997-05-22-mn-61317-story.html (last visited Oct. 31, 2022) (noting that the 1997 Emmys were awarded in May 1997). The Netflix show has also been twice nominated for an Emmy, including one win. *See Carmen Sandiego*, emmys, https://www.emmys.com/shows/carmen-sandiego (last visited Oct. 31, 2022).

book series as well as numerous domestic and foreign films and television shows dating back to the late 1960s, including a television show airing at the time that the contract was signed.[4]

Miller opines that because Schedules 1 and 2 list only consumer goods, the contract requires royalty payments for consumer goods only, not for television series.[5]  Miller Report at 6.  Miller also opines that the definition of Net Sales plainly contemplates consumer goods, as it is calculated with reference to invoice price as well as freight charges, neither of which is associated with television series or films.  *Id.*

The dictionary definition of "products," which is used to define the narrower contractual term "Products," sweeps more broadly than physical goods.  Merriam Webster defines a "product" as "something produced" or "something (such as a service) that is marketed or sold as a commodity."  *Product*, Merriam-Webster, https://www.merriam-webster.com/dictionary/product (last visited Oct. 31, 2022).

Thus, within the four-corners of the contract, there are dueling indicia of the meaning of "Products" that support both Plaintiff's and Defendants' interpretations.  Accordingly, the Court finds that the term "Products" is ambiguous because more than one interpretation of the term is reasonable.  *See Lockheed Martin Corp.*, 639 F.3d at 69 ("[T]he language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement."  *Id.* (citation omitted).).  Thus, while "Products" is not a highly technical or scientific term, expert testimony

---

[4]  *See Pippi Longstocking*, IMDb, https://www.imdb.com/title/tt0062598/ (last visited Oct. 31, 2022); *Pippi Longstocking*, IMDb, https://www.imdb.com/title/tt0163482/ (last visited Oct. 14, 2022); *The New Adventures of Pippi Longstocking*, IMDb, https://www.imdb.com/title/tt0093744/ (last visited Oct. 31, 2022).

[5]  Although Miller includes the products listed on Schedule 2 as a basis for her opinion, as discussed *supra* pp. 7–8, Schedule 2 includes children's products that had been the basis of television series and films at the time of contracting.

regarding industry usage of the term, and terms like "Net Sales," is relevant as it may help the trier of fact resolve the ambiguity surrounding the meaning of the term "Products" as it is used in the Royalty Agreement.

Miller's opinion, however, goes beyond an opinion regarding industry usage of the terms "product" and "net sales,"  Miller opines that "[t]he references to the two schedules — with no description of other types of products, including broadcast, television or film — suggests [sic] that the term 'Products' was intended to cover items similar to the consumer products listed in the schedules,"[6] and further opines that "the reference to 'any other products sold,' suggests consumer products that can be 'sold' at retail."  Miller Report at 6.  Those opinions are based solely on common tools of contract interpretation, namely, the structure and content of the Royalty Agreement, that are equally accessible to the jury.  "For an expert's testimony to be admissible . . . it must be directed to matters within the witness' scientific, technical or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help."  *Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989) (citation omitted).  Because those aspects of Miller's Report fail to offer "specialized knowledge, not possessed by the jury," *United States v. Carson*, 702 F.2d 351, 369 (2d Cir. 1983), they would not be helpful to the jury.  Because they would not be helpful to the jury, they are not admissible pursuant to Federal Rule of Evidence 702(a).

The opinion that "Products" as used in the Royalty Agreement was intended to cover only consumer goods similar to those listed on Schedule 1 also exceeds Miller's role of proffering context regarding industry practice and impermissibly intrudes into the province of the

---

[6]    While Plaintiff has not challenged the Miller Report's reliability, the Court notes that this statement is also incorrect.  Schedule 2 includes references to several popular children's television shows and films.  *See supra*, pp. 8–9.

jury.  In stating "'Products' was intended to cover items similar to the consumer products listed," Miller Report at 6, Miller oversteps her role by opining on the ultimate question for the jury: whether the Royalty Agreement is limited to royalties for consumer products.  When an "expert acts outside of [her] limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination," the testimony usurps the role of the jury in applying the law to the facts.  *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).

In short, Miller may not opine on what the parties to the Royalty Agreement intended by the term Net Sales or Products, but she can testify generally about how the terms "product" and "net sales" are used in the industry.

### C.  Doner's Opinion Regarding a Reasonable Frontend License Fee For Use of the Colorforms Brand Is Inadmissible

Red Hawk objects to the portions of the Doner Report regarding a hypothetical frontend license fee solely on the grounds that it is irrelevant; according to Plaintiff, the sole measure of damages is rooted in the definition of Net Sales contained in the Royalty Agreement.  Pl. Mem. at 9; *see also* Doner Report ¶¶ 16–26.  The Court agrees.  In Plaintiff's amended complaint, Plaintiff claims only that Defendants breached the Royalty Agreement by failing to pay Plaintiff a portion of Net Sales.  Am. Compl. ¶¶ 15, 37.  Plaintiff does not allege that it was due royalty payments based on any source of revenue other than those included in the definition of Net Sales; there is, therefore, no other basis for calculating damages if Plaintiff prevails on liability.

Defendants argue that even though the Doner Report attempts to provide an alternate basis for the calculation of damages that is severed entirely from the Royalty Agreement, the Doner Report will aid the jury in determining damages in the unlikely event that Plaintiff somehow establishes liability on some basis outside of anything contained in the Royalty Agreement.  Def. Opp. at 13.  But Plaintiff's complaint is clear: it asserts that Defendants are

liable because they have failed to pay royalties due under the definition of Net Sales contained in the Royalty Agreement.  *See* Am. Compl. ¶¶ 15, 37.  Thus, there can be no circumstance in which the jury could find that Defendants were liable other than for their failure to pay Plaintiff the agreed-upon proportion of Net Sales.  Accordingly, the hypothetical frontend license fee described by Doner is irrelevant for the purposes of calculating damages.

Defendants further contend that courts routinely permit hypothetical damage calculations "so long as the assumptions relied upon are reasonable."  Def. Opp. at 13.  While "Rule 702 embodies a liberal standard of admissibility for expert opinions," it is not that liberal.  *Nimely*, 414 F.3d at 395.  Courts only permit hypothetical damage calculations where the value of "unique or intangible assets" cannot otherwise be discerned.  *Schofeld v. Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000); *see also LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 503 (S.D.N.Y. 2002).  The value of the allegedly due but unpaid royalty payments can be readily discerned through Net Sales, calculated according to the formula in the Royalty Agreement, which includes license fees in the definition of Net Sales.[7]   Royalty Agreement at 1.  In short, Doner cannot offer an opinion regarding a hypothetical frontend license fee because it is not relevant.

## II.  Motion to Redact the Expert Reports

"It is well settled that the public and press have a qualified right of access to judicial documents and records filed in civil and criminal proceedings."  *Doe v. Pub. Citizen*, 749 F.3d 246, 265 (4th Cir. 2014).  Although "the mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access," an item is a "judicial document" if it is "relevant to the performance of the judicial function and

---

[7]     The Doner Report suggests that Netflix paid an "underlying property license" to Defendant Colorforms LLC.  *See* Cinque Decl. Ex. E ("Doner Report"), Dkt. 79  ¶¶ 38-39; *see also* Miller Report at 7 (discussing the Netflix licensing agreement).

useful in the judicial process." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (internal quotation omitted).  A presumption of access applies to all judicial documents, but "the weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995).  "[A]fter determining the weight of the presumption of access, the court must 'balance competing considerations against it.'  Such countervailing factors include . . . 'the privacy interests of those resisting disclosure.'" *Lugosch*, 435 F.3d at 120 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995) (internal citation omitted)).

In conjunction with Plaintiff's *Daubert* motion, Defendants proposed limited redactions of those portions of the Miller and Doner Reports that "concern[] confidential royalty rates between the parties, specific license terms between certain Defendants and non-party Netflix, Inc., average purchase and exercise prices reflected in an internal database of 9 Story underlying rights agreements, and the hourly rates of Defendants' expert witnesses."  Mot. to Seal at 2. Plaintiff consents to the proposed redactions.  *Id.* at 1.

The Court finds that the expert reports are judicial documents as they directly bear on the Court's duty to determine whether the reports should be excluded pursuant to Plaintiff's *Daubert* motion.  The redacted information concerning the parties' business dealings and the expert's fees, however, has little bearing on whether the *Daubert* motion should be granted, as the information proposed for redaction did not bear on the Court's ruling on the underlying motion. In addition, the Court finds that the privacy interests of the Defendants and non-party Netflix, Inc. are substantial and weigh against the presumption of access.  Accordingly, the motion to redact the expert reports is GRANTED.

## CONCLUSION

For the foregoing reasons, Plaintiff's *Daubert* motion is GRANTED in part and Defendants' motion to seal is GRANTED.  The Clerk of Court is respectfully directed to terminate the open motions at docket entries 75 and 76.  By no later than **November 15, 2022**, the parties must submit a joint letter containing (1) a proposed schedule for next steps, (2) the progress of settlement discussions, if any, and (3) whether the parties request a referral to the court-annexed mediation program or to the assigned magistrate judge for a settlement conference.

**SO ORDERED.**

Date:  **November 1, 2022**
**New York, New York**

_____
**VALERIE CAPRONI**
**United States District Judge**